## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JEMIMA MONYENYE BOSIRE,      )
minor son JOHN BOSIRE, and      )
BERNARD BOSIRE, husband, father  )
Plaintiffs,                         )     **CIVIL ACTION**
                                    )     **FILE NO. 1:14-CV-02604**
v.                              )
THE KROGER COMPANY, and     )
                                    )     **Jury Trial Demanded**
Defendant                   )

## EXPERT REPORT OF RUSSELL J. KENDZIOR

1. My name is Russell J. Kendzior of Traction Experts, Inc., PO Box 92628, Southlake, TX 76092 telephone (817) 749-1705, safety@verizon.net.

2. My Resume, List of Prior Testimony, and Fee Schedule are attached to this Report.

3. Briefly, my experience in the premises safety field includes professional training from the U.S. Department of Labor Occupational Safety and Health Administration (OSHA), from the Texas Accessibility Academy, Texas Department of Licensing and Regulation Compliance Division, and from the American National Standards Institute (ANSI) where I attained certification as a Walkway Auditor Certificate Holder (WACH); I hold professional licensure as a Registered Accessibility Specialist (RAS) with the Texas Department of Regulation and Licensing (TDLR); I have been Committee Secretary for the American National Standards Institute (ANSI) and in this position we authored ANSI B 101 "Safety Requirements for Slip, Trip, and Fall Prevention"; I have also been a Voting Member on seven sub-committees including C-21 Ceramic Tile, D-13 Textiles, D-21 Polishes, E-58 Forensic Engineering, F-06 Resilient Floor Coverings, F-13 Walkway Safety and Footwear, C-14 Glass and Glass Products, and F-15 Consumer Products.

4. I am a member and past member of the Board of Delegates of National Safety Council (NSC); I also have professional association with National Fire Protection Association (NFPA), American Society of Safety Engineers (ASSE), American Society of Mechanical Engineers (ASME), American College of Forensic Examiners Institute, The Society of Protective Coverings (SSP C.7.5 Texture of Concrete Coatings), and The Association of Certified Fraud Examiners.

5. I am the author of two books on the subject of slip, trip-and-fall accident prevention including: "Slip and Fall Prevention Made Easy" (copyright 1999) and "Falls Aren't Funny" published in 2010 and named the Number 1, Best Seller in Personal Injury Law by Amazon.com and I have published numerous other articles relevant to this case as found on my Resume.

6. In Falls Aren't Funny: America's Multi-Billion Dollar Slip-and-Fall Crisis, I provide a comprehensive look at one of the most pervasive yet seldom addressed problems facing our world today. The book's three parts explore slips-and-fall accidents themselves, what causes them, and what can be done to prevent them. I begin by examining the financial costs, the industries hardest hit by slips and falls, and the heightened risk to the elderly population. I then looks at the causes for the numerous slip-and-fall accidents and injuries, from inadequate floor care to improper footwear, and the contributions of the insurance, legal, and manufacturing industries and how they worsen the problem. Finally, I outline what can be done to prevent slip-and-fall accidents, and how everyone from manufacturers, to property owners, to the general public can help to reverse the trend of this increasingly expensive and dangerous problem.

7. In SLIP AND FALL PREVENTION MADE EASY:
A COMREHENSIVE GUIDE TO PREVENTING ACCIDENTS, I aim to increase awareness and understanding of slip-and-fall accidents on both the ship floor and the showroom floor and to provide all industries with the information needed to prevent future incidents from occurring.

8. I have been retained as an expert witness in more than 400 lawsuits and I have worked for both plaintiffs and defendants.

9. I am the founder of the National Floor Safety Institute (NFSI) and the President of Traction Experts, Inc.

10. I am the author of "OSHA Self-Inspection Checklist" and was an active participant in the creation of numerous walkway safety standards including the afore-mentioned ANSI B101 Safety Requirements for Slip, Trip and Fall Requirements.

11. I have participated in professional seminars and performed public speeches and lectures on the topic of premises safety to Georgia Tech OSHA Outreach, Murray State University, Southeast Oklahoma State University, Emory University, OSHA, Consumer Product Safety Commission, Centers for Disease Control, Department of Defense, National Restaurant Association, International Executive Housekeepers Association, Cleaning Management Institute, International Facilities Maintenance Association, AIG Insurance, CNA Insurance, Willis Insurance, State Farm Insurance, McDonald's Corporation, Home Depot, Yum! Brands, Smithsonian Institute, among others.

12. As listed above, the numerous training sessions for public and private employers and employees I have conducted regard premises safety including advising employers on instituting training procedures to employees with a design toward preventing slips, trips, and fall downs.

13. With regard to this case I have reviewed the surveillance video of the store in which the fall down occurred, its aftermath, and footage captured before the fall including approximately one hour and fifteen minutes before the fall. Specifically the surveillance footage provided begins at 3:45pm I have also reviewed footage following the fall down at 5pm continuing for approximately one hour.

14. I have reviewed Kroger's policies provided in discovery; I have reviewed the deposition of Kroger manager Jessica Curry, photographs of the Kroger store, and the Court's Order on Summary Judgment.

15. I have reviewed Kroger's Incident Report and Kroger's discovery disclosures. I have knowledge about Kroger's STAR program and Kroger's safety guidelines and meetings program.

16. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience,

training and knowledge of premises safety, of policies and safety execution of other similar and like companies as the defendant, as well as my continued research and work with premises safety nationally and internationally. This work includes conducting training around the United States and auditing the operations of other similar and like companies and government operations and regulations. My opinions are provided with a reasonable degree of certainty within the field of premises safety, training, and supervision. I am familiar with premises safety, training, and supervision and know the normal phases of litigation. With this in mind I recognize that there may be additional documentation and testimony as the case progresses. In the event that additional material is produced and provided I shall be prepared to supplement this report.

17. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

18. The fall-down event occurred on August 31, 2013 at 5pm in the Produce section of the store.

19. Produce sections of retail supermarkets, speaking generally, account for a majority of fall-down locations; in comparison to other areas of retail grocery stores the produce section is most prone to clientele falling. This is due to the slipperiness of fresh and cold food product, misters, and that small fruits and loose vegetables have less packaging and can and do fall onto the floor, break, and turn into hazards (more so than packaged items).

20. Kroger's co-manager Jessica Curry admits Plaintiff fell in the Kroger store due to Kroger's floor having a wet sticky substance.

Curry Depo Pages 20, 26:

17· · · ·Q· · And it looks like you wrote, Customer slipped
18· on liquid in produce.
19· · · ·A· · Uh-huh.
20· · · ·Q· · Why did you -- why did you write that, do you
21· think?
22· · · ·A· · Because I saw the liquid there.· When we go
23· down, we inspect what -- what is there on the floor.
24· · · ·Q· · Uh-huh.
25· · · ·A· · And I saw a wet, sticky substance.

12· · · ·Q· · Okay.· And so the next page, it's dated
13· August 31, 2013, the same date of the incident?
14· · · ·A· · Uh-huh, yes.
15· · · ·Q· · And then at the bottom it says, Witness came
16· up to the substance on the floor.· It looked like her
17· feet went out from under her, and she fell on her left
18· side.
19· · · · · · Did you write that based on -- what exactly?
20· Did -- somebody told you about that or somebody
21· witnessed it or how did you come to that conclusion?
22· · · ·A· · Oh, I -- I viewed that video. Curry Depo, Page 26

21. 30 minutes before the fall at 4:29:22 pm a Kroger sweeper/cleaner cursorily swept the aisle where the fall would later occur.

22. 1 minute after a cursory sweeping (and 29 minutes before the fall) the garbage cart went through where the fall would later happen effectively nullifying the sweep.
Curry Depo, Page 117 and Exhibit 11 to Curry Depo:
· · ·Q· · All right.· So if -- if that cleaner sweeps
11· and the garbage cart then moves through the area where
12· the gentleman swept, and if anything came out of the
13· garbage truck that might have been sticky, that sweeping
14· would have been no longer clean.· Is that right?
15· · · · · · MS. JONES:· Objection.
16· · · · · · THE WITNESS:· Yeah.· He did the sweep before
17· · · ·there.· He wasn't over there when the -- after the
18· · · ·cart went through.
19· BY MR. GEWIRTZ:
20· · · ·Q· · And is this Exhibit 11 where the cart goes
21· following that sweep?
22· · · ·A· · Yes.
Page 117

23. The garbage cart dropped garbage and stopped in the location where Plaintiff would later fall.· Curry Depo Pages 97-98; 111-112; 118-119; Exhibit 12 to Curry Depo:
· · ·Q· · What I was doing here is playing you the

18· surveillance footage at 4:29 and 32 seconds, and I think
19· we're going to see the garbage cart do something.
20· · · · · · Tell us what happens, please.· See that?
21· · · ·A· · Uh-huh, something fell off the trash cart.
22· · · ·Q· · Okay.· And what was it that fell off the trash
23· cart do you think?
24· · · ·A· · I don't know, but it's just a bag of
25· garbage --

Page 98

·1· · · ·Q· · And he's hauling garbage --
·2· · · ·A· · -- a bag.
·3· · · ·Q· · -- from where exactly?
·4· · · ·A· · The bakery.
·5· · · ·Q· · And where else?
·6· · · ·A· · Well, it could be deli/bakery.

·

· · · · MR. GEWIRTZ:· Okay.· And this is going to be
11· · · ·12.
12· · · · · · (Exhibit 12 was marked for identification.)
13· BY MR. GEWIRTZ:
14· · · ·Q· · And would it be accurate to say that at
15· 4:30:16, based on the footage that we watched and what
16· shows on this camera, that a little bit of garbage fell
17· before entering the aisle?
18· · · ·A· · From this picture?
19· · · ·Q· · Well, do you remember seeing some --
20· · · ·A· · I remember seeing him, yeah, back towards the
21· bakery where garbage fell.

Page 118

17· · · ·Q· · Okay.· And you did see that some of the bags
18· or boxes were falling off the garbage cart, correct?
19· · · ·A· · Yeah.· Back towards the bakery I saw that.

Page 111

24.· · · · · The garbage cart was hauling a larger than usual load.
Curry Depo Pages 103-104, 112-113:

20· · · ·Q· · And how frequently would a trash load that
21· size be emptied?
22· · · ·A· · I am not sure.· They -- it's probably from the
23· whole day because they come in and prep all day.· And

24· then they'll stack it.· And when -- you know, if it gets
25· too full for them, they'll take it out themselves, but
Page 104
·1· otherwise they wait for the expansion clerk.


20· · · ·Q· · And how frequently would a trash load that
21· size be emptied?
22· · · ·A· · I am not sure.· They -- it's probably from the
23· whole day because they come in and prep all day.· And
24· then they'll stack it.· And when -- you know, if it gets
25· too full for them, they'll take it out themselves, but
Page 104
·1· otherwise they wait for the expansion clerk.


17· · · ·Q· · Why would two people work on the garbage cart
18· as opposed to one person?
19· · · ·A· · Different shifts.
20· · · ·Q· · Okay.· But would that be in response to a lot
21· of garbage, more garbage than normal?
22· · · ·A· · Probably, yeah.
23· · · ·Q· · And the condition of the cart as we saw it was
24· not more than normal size garbage.
25· · · ·A· · Well, they usually take that much out, but the
Page 113
·1· boxes probably should -- is not normal.· Usually they
·2· just take the trash out, and then they'll take boxes
·3· back.


25.· · · · · No Kroger employee follows or checks to make sure no debris or
residue has been left in the garbage cart's wake.
Curry Depo Pages 111-112:
20· · · ·Q· · Okay.· And is it normal or ordinary course for
21· somebody to follow the garbage cart after it leaves the
22· store?
23· · · ·A· · No.
24· · · ·Q· · So no one at Kroger makes sure that the
25· garbage cart has left anything in its path?
Page 112
·1· · · · ·A· · No, the person pushing the cart.

·2· · · ·Q· · The person pushing the cart is responsible for
·3· making sure nothing leaks?
·4· · · ·A· · Uh-huh, yes.

26.⠀⠀⠀⠀The garbage cart was not utilizing cart straps as referred to in
Kroger's policy.
See Kroger "Stores Targeting Accident Reduction Program "STAR"" Policy
Page 000038 of Kroger's confidential document production.

27.Kroger does not block off the aisles to empty the garbage nor take other
reasonable precautions that other similar and like big box stores take when
stocking items or emptying garbage. See Curry Depo Pages 89-90:

· ·Q· · Okay.· Now, what's happening at 4:29:08?· What
19· happened?
20· · · ·A· · Joey moves over to the back of the table with
21· his cart.
22· · · ·Q· · So Joey is now blocking the aisle that the
23· garbage guy tried to go through before he retreated.· Is
24· that right?
25· · · ·A· · Yeah.· I don't think he's blocking the aisle.
Page 90
·1· I'm not -- his cart is probably closer to the -- because
·2· we can't block aisles for shoppers to get through.· Like
·3· he's stocking.
·4· · · ·Q· · So you're saying it's against the rules to
·5· block an aisle?
·6· · · ·A· · Well, it's not like rules, but just so the
·7· customer can get through an aisle.· We don't want to
·8· block them from getting through, shopping.· But it's not
·9· really a rule.
10.

28.⠀⠀⠀⠀At 4:30:19 pm, after dropping garbage seconds earlier, the garbage
cart stops in the aisle where Plaintiff would later fall, and no one inspects or
cleans the residue.

29.⠀⠀⠀⠀Over the next 13-14 minutes approximately 10-12 shoppers shop
through the aisle where Plaintiff would later fall; none on exact spot where

garbage cart stopped and where Plaintiff would later fall. . See Exhibit 13 to Curry Depo.

30. No Kroger employee follows the garbage cart after it traverses the aisles.

31. This is important because it shows Kroger created and increased the hazard. The produce section is already hazardous enough- bringing more hazards into an already hazardous section is not reasonable and the relevant training demands and advises against this type of adding 'fuel to the fire' form of garbage disposal. The methods we teach and that are provided by other like and similar stores and government entities is to be very careful not to add hazards where hazards already exist.

32. No Kroger employee checks to make sure nothing has spilled or leaked from the garbage cart. Kroger chooses not to have their employees do that:

· ·Q· · The question is, is it possible to have a
15· staff member follow the cart after the cart goes out?
16· Is it possible?
17· · · ·A· · Oh, it can be possible, but it's not done.
18· · · ·Q· · Okay.· So you choose not to have someone
19· follow --
20· · · · · · MS. JONES:· Objection.
21· · · · · · THE WITNESS:· Well, we don't choose that.
22· · · ·It's just -- it's not something we practice there.
23· BY MR. GEWIRTZ:
24· · · ·Q· · But you're aware --
25· · · ·A· · We don't choose it, to -- you know, to follow
Page 155
·1· them.

16· · · ·Q· · Okay.· So do two people ever walk with one
17· garbage cart?
18· · · ·A· · Usually not.

· · ·Q· · And 4:30:25 the garbage leaves that section,
·5· the middle section of the aisle.
·6· · · · · · And I want you to -- what I want you to tell
·7· me is when is the next time after the garbage cart goes

·8· through that aisle that anyone cleans the section where
·9· the garbage cart was.
10· · · · · · Okay.· I'm going to just rewind a few clips
11· here.· And what we've been doing is since the garbage
12· truck went through that aisle, we've been playing video.
13· · · · · · And have you seen anyone up until around the
14· 4:44 and 27 second mark clean or follow up where the
15· garbage truck went?
16· · · ·A· · No.


33. 16 minutes before the Plaintiff falls a female shopper steps in the location
where the garbage cart went through and her foot sticks to the floor at
4:43:30 pm.


34. At 4:43:30 a woman in a white top with gray pants sticks to something left
on the floor [foot gets stuck in same location as the garbage cart spill and
same location where Plaintiff will soon fall],


35. At 4:43:52 the woman looks down at and lifts her foot to see the stickiness
on her shoe.· Curry Depo Pages 122-123 and Exhibit 14 global:
1· You might be
·2· able to look at Exhibit 14 global, and tell me what it
·3· looks like is happening.
·4· · · ·A· · It looks like there's a customer over by where
·5· the fall happened, looking at product.
·6· · · ·Q· · Uh-huh.· And then on the next page?
·7· · · ·A· · And she's pushing her buggy away from it.
·8· · · ·Q· · Uh-huh.· And then what does she do?
·9· · · ·A· · Looks like she's looking down into her buggy.
10· · · ·Q· · And then what does she do?
11· · · ·A· · And it looks like she's looking under her foot
12· at the floor.· Looks like she has her leg lifted.
13· · · ·Q· · Okay.· And what does that indicate to you?
14· · · ·A· · That she's looking at something on the floor.
15· · · ·Q· · Something that might be stuck to her foot or
16· her shoe maybe?
17· · · · · · MS. JONES:· Objection.
18· · · · · · THE WITNESS:· Yeah, that I don't know.· It

19· · · ·just shows her looking down, like, you know,
20· · · ·looking at something.
21· BY MR. GEWIRTZ:
22· · · ·Q· · Okay.· And what's the next one show?
23· · · ·A· · It looks like she's still looking down with
24· her foot raised at a different angle.
25· · · ·Q· · Okay.· So it looks like she might have raised
Page 123
·1· her foot?
·2· · · ·A· · Uh-huh.
·3· · · ·Q· · Does it look like she might be looking at the
·4· bottom of her foot to inspect it?
·5· · · · · · MS. JONES:· Objection.
·6· · · · · · THE WITNESS:· I can't tell that.
·7· BY MR. GEWIRTZ:
·8· · · ·Q· · Why do people usually look down at their foot
·9· at your store, if that ever happens?
10· · · ·A· · Well, they -- if they -- well, if they would
11· have stepped in something, but I can't tell if she's
12· looking at her foot or just what's on the floor or if
13· something dropped.· I can't tell whether she's looking
14· at her foot or the bottom of her shoe in there.· Looks
15· like her foot is raised.

36. At 4:46:47 Kroger sweeper/cleaner named Gregory Merwitz comes through the Produce section and is within close vicinity to and has an unobstructed view of the exact location of the previous garbage spill/stickiness on the floor where the woman stepped and then looked down at her sticky foot/location of fall but does not inspect, does not turn to sweep the perpendicular aisle where the garbage cart went through and where the lady with the white top stuck to the floor and skips the precise location of the stickiness.  Curry Depo Page 55, Page 90, Page 94.

37. 13 minutes pass between when Kroger cleaner comes in holding one hand on broom and does not turn to clean that specific perpendicular aisle where the garbage cart went through.  Kroger employee Gregory Merwitz is within close vicinity to the hazard but fails to identify it, remove, or warn of the hazard.  See Exhibit 16, global.

38. Kroger employee/sweeper Merwitz was in the immediate vicinity (within 5 feet) of where the garbage cart dropped garbage, where the woman's foot stuck to the floor, and where the fall occurred but passed by the precise location of the sticky substance (failing to sweep or visually inspect that aisle though doing so would have only required an extra 3 seconds, 3 steps and a simple turn of the body and broom).

·Q· · Okay.· Global 16 is captured from 4:46 and 47

·8· seconds on.· Take a look at that.

·9· · · ·A· · (Witness complying.)

10· · · ·Q· · And tell us what you see there.

11· · · ·A· · He's doing a floor sweep.

12· · · ·Q· · Okay.· And who is that?

13· · · ·A· · Greg Horwitz.

14· · · ·Q· · Uh-huh.

15· · · ·A· · And he's just coming up the outside of the

16· tables.

17· · · ·Q· · So is he --

18· · · ·A· · And looks like --

19· · · ·Q· · -- sweeping the area that wasn't swept before

20· in the first pass a half an hour before?

21· · · ·A· · No.

22· · · ·Q· · I'm sorry?

23· · · ·A· · No, he's not.· It doesn't show in this.

24· · · ·Q· · So my question was, is he now sweeping the

25· area that he missed on the previous pass?

Page 125

·1· · · ·A· · Oh, I'm sorry, I thought you meant the area

·2· wherever they fell.· Yes, he is.

·3· · · ·Q· · So you're saying -- you said that you thought

·4· that I said the area where she fell.

·5· · · ·A· · Right.

·6· · · ·Q· · So you're saying he did not sweep the area

·7· where she fell?

·8· · · ·A· · Well, he's -- he didn't come up through that

·9· aisle right here in these pictures at this time frame.

10· He went around the front table it looks like, where he's

11· heading.

12· · · ·Q· · Okay.· And how far would you say, based on

13· those pictures that come from the video, did he come

14· from the -- was he from the area where my client,
15· Mrs. Bosire, fell?
16· · · ·A· · How far from the area?
17· · · ·Q· · Yes.
18· · · ·A· · From where he is right here?
19· · · ·Q· · Uh-huh.
20· · · ·A· · Probably about eight to ten feet --
21· · · ·Q· · Okay.
22· · · ·A· · -- or a little longer.
23· · · ·Q· · Okay.· So let's look at global -- the first
24· page of the global exhibit.
25· · · ·A· · Uh-huh.
Page 126
·1· · · ·Q· · And I'm just going to walk over here real
·2· quick so I can see.
·3· · · · · · And in -- on the first page of Global 16, how
·4· far away would you say he is from where my client later
·5· fell?· Is it less than five feet?
·6· · · ·A· · No.· I think it's more.
·7· · · ·Q· · Okay.· How many feet would you say it is?
·8· · · ·A· · Well, probably, I would say, at least 10 to
·9· 12 feet.
10· · · ·Q· · Okay.· Can you turn the page to Global 16,
11· page 2.
12· · · ·A· · Uh-huh.
13· · · ·Q· · Now, how many feet would you say is he on that
14· page 2 of Global 16?
15· · · ·A· · Looks like it would be about five or six feet.
16· · · ·Q· · Okay.· And let's go to the next page.
17· · · · · · And now he -- looks like he is -- would you
18· say that is he -- if there was something on the floor at
19· that point, and he walked by it, that he could have or
20· should have cleaned that aisle?
21· · · · · · MS. JONES:· Objection.
22· BY MR. GEWIRTZ:
23· · · ·Q· · You can answer.
24· · · ·A· · I mean I don't -- if he saw something, he
25· might have seen something.· I don't know.
Page 127
·1· · · ·Q· · Would you say that by walking by the angle,

·2· the aisle, he had the opportunity to see something
·3· sticky, if there was something sticky on the floor?
·4· · · · · · MS. JONES:· Objection.
·5· · · · · · THE WITNESS:· I mean he could have.· Anybody
·6· · · ·could have seen that.
·7· BY MR. GEWIRTZ:
·8· · · ·Q· · Okay.· So you're saying he could have had the
·9· opportunity to see it.
10· · · ·A· · If he was looking down that direction.
11· · · ·Q· · Okay.· Let's go to the next page --
12· · · ·A· · Okay.
13· · · ·Q· · -- which is page 3.· And this is just multiple
14· screenshots.
15· · · · · · And on the bottom right-hand corner, what does
16· it look like he's doing in that -- in that photo, that
17· screenshot?
18· · · ·A· · It looks like he turned away from the broom.
19· · · ·Q· · Sorry?
20· · · ·A· · It looks like he's holding the broom, but he
21· turned away from it --

39. The garbage cart is more than normally full; contains messy items; Kroger chooses to only have one person do the garbage disposal even for a larger than usual load such as this; Kroger does not block off the aisles nor does it have a worker follow the garbage out to inspect its wake, all of which are unreasonable.

.25....Q..So we said earlier that sometimes the garbage
Page 153
·1· from the deli and the garbage from the produce section
·2· can be wet and slimy, right?
·3· · · · ·A· · Not the garbage itself, what they put into it.
·4· · · · ·Q· · Say this again for me?
·5· · · · ·A· · The garbage that they put into the garbage
·6· bags, it can be.

40. Throughout the day of the fall in this case the Floor Inspection tracking mechanism was not working properly; the Floor Inspection Report for the day of the fall shows a special needs grocery bagger named Maureen Merola was the only inspector that day for all floor inspections.  See Floor Inspection Report Exhibit 6 and Curry Depo Pages 149-150:

· · ·Q· · And we already said that this is the sweep
·3· log, right?· This thing --
·4· · · ·A· · Uh-huh.
·5· · · ·Q· · -- Exhibit No. 6 --
·6· · · ·A· · Uh-huh.
·7· · · ·Q· · -- that's the sweep log.
·8· · · · · · And based on what you've told me today, that
·9· sweep log is totally inaccurate.· Is that correct?
10· · · ·A· · Yes.


11· · · ·Q· · Okay.· And the sweep log is supposed to be
12· somebody who checks that sweeps are being done or that
13· actually sweeps?
14· · · ·A· · These are actually sweeps.· They're
15· actually -- they punch for them, the time clock.
16· · · ·Q· · So that -- the time clock punching is
17· accurate, but just the names are not accurate you think?
18· · · ·A· · Yes.
19· · · ·Q· · Okay.· How can you be sure that the times are
20· correct on the punch duty?
21· · · ·A· · Well, they punch the time clock, and it's kept
22· in our time -- our Kronos, which is our time from the
23· time clock, so it catches the accurate dates and times.
24· · · ·Q· · But in order to actually punch it, do they
25· have to have a code that they enter?
Page 150
·1· · · ·A· · Yeah.· They have their own number.
·2· · · ·Q· · But this sheet doesn't reflect that they're
·3· entering their own number, does it?
·4· · · ·A· · Well, they would have to because they're
·5· fingerprinted.
·6· · · ·Q· · Okay.· So it reads fingerprints?
·7· · · ·A· · Uh-huh.
·8· · · ·Q· · It read -- but it -- but does it reflect the

·9· individual's fingerprint anywhere on that page?

10· · · ·A· · Not on the page, no.· But in order for them to

11· clock in their time, they put their finger, the -- it

12· takes their fingerprint, along with their number.

13· · · ·Q· · And they have to use their fingerprint when

14· they're using this clock punch --

15· · · ·A· · Uh-huh.

16· · · ·Q· · -- time punch --

17· · · ·A· · Uh-huh.

18· · · ·Q· · -- cleaning punch?

19· · · ·A· · Uh-huh.

20· · · ·Q· · Okay.· Now, you said that it's accurate as to

21· the time, but not as to the individual.· But the

22· individual was actually using their fingerprint in order

23· to make an imprint on the computer somehow.· Is that

24· correct?

25· · · ·A· · Yeah.· They are making their fingerprint, but

Page 151

·1· she could not have clocked -- I don't know what -- like

·2· I said before, I don't know what happened with the

·3· names, but she was not here during that time.

·4· · · ·Q· · But wouldn't her name be read by the

·5· fingerprint or vice versa?

·6· · · ·A· · It's supposed to be, yes


41.11· · · ·Q· · So you have a master cleaning calendar for

12· produce as well?

13· · · ·A· · Yes, they have one.

14· · · ·Q· · And does it look similar to that?

15· · · ·A· · Yes.

16· · · ·Q· · And do you maintain those records?

17· · · ·A· · Yes.· Well, they have the board.

18· · · ·Q· · Do you keep them after the --

19· · · ·A· · No, no.· This is dry erase.

20· · · ·Q· · Dry erase.· So you do --

21· · · ·A· · Each period -- or when they fill it up through

22· the periods, they erase it and do it over.

23· · · ·Q· · And the same is true for produce?

24· · · ·A· · Uh-huh.

25· · · ·Q· · Same true for deli?
Page 131
·1· · · · ·A· · Uh-huh.
·2· · · · ·Q· · Same true for bakery?
·3· · · · ·A· · Deli/bakery has their one, just one.
·4· · · · ·Q· · They have a joint one?
·5· · · · ·A· · This is mainly -- the cleaning schedule is
·6· mainly for their shelving, to clean their tables or
·7· their shelving when they have to pull everything out. more spoliation?


42.· ·Q· · Okay.· So as we're sitting here today, we
13· can't tell who was assigned to do sweeps in advance of
14· the fall down that happened with my client?
15· · · · · · MS. JONES:· Objection.
16· BY MR. GEWIRTZ:
17· · · ·Q· · Is that right?
18· · · ·A· · Not by this, no.
19· · · ·Q· · Okay.· And do you know how long your office
20· usually retains the schedules of the sweepers?
21· · · ·A· · I'm not sure on that.· The handwritten
22· schedule that they do for the day?
23· · · ·Q· · So it's a handwritten schedule?
24· · · ·A· · Uh-huh, uh-huh.
25· · · ·Q· · Okay.· So are you saying that you don't know
Page 66
·1· whether or not you keep that and you don't know whether
·2· or not -- well, what was your response?
·3· · · · ·A· · Yeah.· I really don't know the answer to that
·4· question.


43. Kroger admits the garbage cart dropped garbage and stopped within very
close proximity to the location where the fall later happened

44. Kroger admits the fall was caused by a wet sticky substance

45. Kroger admits the garbage cart dropped garbage off the garbage cart

46. Kroger admits the contents of the garbage include sticky residue and that Plaintiff fell in the Kroger store due to Kroger's floor having a wet sticky substance

47. Kroger admits no one follows or checks to make sure nothing has been left in the garbage cart's wake; Kroger admits it does not monitor or check surveillance after a person falls to ensure clean-up staff are held accountable., this practice is unreasonable and does not follow common industry practice.

48. A Kroger employee was within close proximate vicinity to hazard but failed to remedy the hazard. This failure to look, failure to sweep and the manner in which the employee fails to properly inspect and fails to properly clean are unreasonable. First, as to manner, the broom should not be held in such a lackluster manner. A proper and reasonable inspection demands the broom be held in a focused and serious manner with an aim to seek out and fix hazards. The sweeper in this case does not appear to be providing the serious attention needed nor is he trained or supervised to remedy this problematic lack of inspection and failure to properly clean.

49. Kroger does not supervise the way in which its cleaners clean nor do supervisors monitor the manner of cleaning, route, and direction.

·Q· · But as far as actually how a person approaches
25· a broom, there's not any special instruction that you
Page 93
·1· know of that goes with that?
·2· · · ·A· · Huh-uh, not that I know of.
·3· · · ·Q· · Okay.· And what about the route that they do?
·4· Is there any special instruction about what route
·5· they're supposed to sweep?
·6· · · ·A· · No, we don't have any -- no.
·7· · · ·Q· · You just say, Go sweep --
·8· · · ·A· · Yeah.
·9· · · ·Q· · -- the whole place?
10· · · ·A· · Uh-huh.

and not watching surveillance, not checking to see if it was done on video
· ·Q· · Okay.· And what do you do if you find a spill?

·6··· ·A·· I'll page somebody and -- to get them to come.
·7· And I'll stay right there with it until they come with
·8· cones, and they clean it up themselves.
·9··· ·Q·· And then do you go and check and see who was
10· assigned to do the sweep?
11··· ·A·· No. page 65

50. Kroger managers allow employees to inspect/sweep floorspace in whatever fashion they choose trusting them to cover entire space each aisle recorded only that special needs individual Maureen Merola was the inspector Kroger manager is fine with this technique

· ·Q·· And what's he look like he's doing now?
·9··· ·A·· It looks like he has his fingers up to his
10· mouth --
11··· ·Q·· Is it --
12··· ·A·· -- holding the broom.
13··· ·Q·· Is it better in your opinion to have two arms
14· on the broom --
15······ MS. JONES:· Objection.
16······ MR. GEWIRTZ:· -- when you're sweeping?
17······ THE WITNESS:· No.
18· BY MR. GEWIRTZ:
19··· ·Q·· So you think it's just as effective to have
20· one arm on the broom --
21··· ·A·· Yeah.
22······ MS. JONES:· Objection.
23······ MR. GEWIRTZ:· -- when your sweeping?
24······ THE WITNESS:· Yeah.· They usually push it with
25··· ·one arm through the store.

·1· BY MR. GEWIRTZ:
·2··· ·Q·· And you approve of that one-arm technique?
·3······ MS. JONES:· Objection.
·4······ THE WITNESS:· I do.· I don't -- there's really
·5··· ·not rules whether you use one hand or two hands

51. No supervisor one monitors the surveillance cameras in the office

4......Q..And you also have the surveillance camera access feeds in your
5......office?
6......A...Yes
7......Q...So they're on screens in the office?
8......Yes
9......Q...And is there somebody in the who's
10.....constantly monitoring them?
11...A..No

Page 136
·Q· · So they watch surveillance?
11· · · ·A· · No, they don't watch surveillance.

52. Kroger has only five Spill Magic stations in the entire store.
    Curry Deposition page 23.

53. After the garbage cart drops, stops, and then goes through the aisle no
    Kroger employee including cleaner Merwitz goes into aisle where garbage
    cart traversed for more than 30 minutes.

54. This lack of communication and coordination between the initial sweeper
    and the garbage is inexcusable and exhibits a lack of supervision and
    training.

55. The garbage cart is more than normally full; it contains messy items; and
    Kroger chooses to only have one person do the garbage disposal; this again
    exhibits a lack of supervision, proper policy and shows poor training.

56. This failure in training and strategical oversight is unreasonable.

57. Throughout the day of the fall in this case the Floor Inspection tracking
    mechanism was not working properly; the Floor Inspection Report for the
    day of the fall shows a special needs grocery bagger named Maureen Merola
    was the only inspector that day for all floor inspections. This again exhibits
    lack of proper supervision.

58. Kroger does not supervise the way in which the cleaners clean nor do they
    monitor the manner of cleaning, route, and direction.

59. Kroger's managers allow employees to inspect/sweep floorspace in whatever fashion they choose trusting them to cover the entire space and without proper supervision.

60. That no one monitors the surveillance cameras in the office nor checks after a fall to see which employee may have missed a hazard further exhibits lack of proper supervision

61. This [lack of] training and supervision do not meet the standards of OSHA

62. Kroger created the slipperiness or stickiness of the floor that caused the fall in this instance.

63. Kroger's practices in bringing deli trash into the produce section is against good training and against good sense. Most falls categorically occur in produce. Produce is slippery enough already. Traipsing deli trash through produce is bad policy and dangerous procedure. The Deli creates very slippery waste products and deli meats are slimy and sticky and bringing them into the Produce environment creates new hazards with sloppy cleaning conditions. One worker hauling overloaded Deli trash though Produce and then not looking behind afterward reflects poor policy and training.

64. That Kroger co-manager Jessica Curry believes the one armed push technique for sweeping and is proper reflects poor supervision and training. Cleaning solution is necessary to clean up Deli meat trash. More Magic Spill and soap and mop buckets should be posted throughout the store for easy access- 5 is not enough for a store of this size. Moreover slick and slippery waste should not go through Produce to begin with. Sweeping even with two arms is not going to get the discarded Deli meats off the floor. Instructing staff to maintain two hands on the broom however more reflects the serious and vigilant nature with which staff members should be carrying out their cleanings and inspections.

65. There is definite supervision lacking here. Training cannot be that one hand on a broom is sufficient, this sends the wrong message to staff; training must be to constantly and vigilantly be on the lookout for hazards- this worker was not actively seeking spills he was preoccupied with what appears to be

his thumb or a candy or some other preoccupied fixation. The worker was not being monitored or surveilled either- he was not being watched, checked, rewound and sped up, there was no monitoring of any kind except he was required to check in with a thumbprint after doing a jog, prance, or lollipop around the store. Then this thumbprint does not record the person associated with that thumb on the computer check-in recorder- The computer is setup to populate only the name of a special needs associate who was hired to bag groceries, only the name Maureen Merola appears. This should not to be the last line of defense for accountability to monitor the store's cleanliness and does not serve as proper supervision of staff.

66. Meanwhile, in the frozen section of the store for the entire duration of the surveillance footage provided there is an unmonitored yellow caution sign in the beer aisle.

67. It is my opinion, based upon my specialized background, training, education, and experience, as well as my continued research, authoring, auditing, training, and consulting on premises safety that this Kroger store's training and supervision were inconsistent with generally accepted practices, policies, training and government mandates for premises safety training, supervision and practices to prevent slips, trips and falls in a retail establishment.

68. The act of bringing discarded deli meats into the produce section, then spilling it creating the hazard and then failing to properly clean it up, notice it, recognize it despite multiple opportunities and two close encounters constitutes a failure to render the hazard inert and reflects improper training and supervision (in particular the admitted refusal to watch surveillance and admitted choice to have a policy *not* to have two workers empty the garbage- either by emptying it before it gets too full or utilizing two workers when it is too full) reflects unreasonable operating procedure. The failure to train and/or instruct employees falls below what is considered reasonable care in the broader industry and in comparison to the operation of like and similar retail establishments which have demonstrably better training, supervision and results (such as Pier 1 stores).

69. Some of the publications which specifically refer to reasonable training and practices to prevent slips trips and fall include those mentioned in the National Institute for Occupational Safety and Health, Workplace Solutions

Bulletin entitled "Preventing Slips, Trips, and Falls in Wholesale and Retail Trade Establishments" (attached); the website of the National Floor Safety Institute (NFSI), which I founded, is listed as a reference.

70. I am also attached to this declaration a listing of important premises liability codes and standards which I will discuss during testimony, the National Safety Council's 2006 Facilitator Guide publication on Preventing Trips, Slips and Falls published by OSHA, the ASTM F1637-13 "Standard Practice for Safe Walking Surfaces", and the ASSE Tech Brief on ANSI/ASSE A1264.2-2012.

71. At this point in the development of this case I do not know which precise demonstrative aids I will utilize during my testimony but as I determine which will be used I will assure that they are made available for review, if requested, prior to their use.

This report is signed under penalty of perjury on this 12 day of January in Southlake, Texas.

Russel J. Kendzior

This 12 day of January, 2016.